cetera, and I'm here on behalf of the family of Diane Simpson, the husband and children of Ms. Simpson, who are the plaintiffs in the proceeding below and who are the appellants before the court in this proceeding. As the court is aware, this is the second time that this case has come before the court. This case came before the Fifth Circuit on a prior summary judgment. In that case, the court affirmed the district court's summary judgment on the episodic acts and omissions claims that plaintiff had raised and then remanded the case to the district court to determine whether a fact issue existed as to plaintiff's claims on conditions of confinement. The district court then granted summary judgment again on plaintiff's claims for conditions of confinement, and here we are. There are several errors raised in the briefing, but today I would like to focus the court's attention on two of those errors. One is the district court's finding that there is insufficient evidence of causation to raise a fact issue on the de facto policy that the district court recognized was raised by the evidence, and that is a de facto policy of failing to complete the suicide intake forms and assess suicidal tendencies at intake. The second error I'd like to talk about is the court's narrowing of that claim and failure to find evidence sufficient to raise a fact issue on a broader de facto policy of a system automatic failure of the Young County Jail to properly assess and evaluate the mental health and medical needs of intoxicated detainees coming into the jail. Now as to the court's no evidence on causation finding, in its analysis, the district court looked to this court's decision in what I'll refer to as Sanchez 1. In that case, this court talked about the fact that these were really just matters of file documentation. The court noted that there was no evidence in that record that had, for example, what's called the continuity of care query, the CC Cuban run, that it would have even showed a match for Ms. Simpson. In its causation analysis, the district court below really grabbed onto this court's analysis in Sanchez 1. It again asserted that these were just matters of file documentation. So while the court did find evidence of a pervasive pattern sufficient to raise a fact issue on a de facto policy, it found there was no evidence that failure to complete the screening form resulted in a denial of the constitutional right to medical care. The problem with the court's analysis, well it's flawed in several respects, but one problem is that the record before the district court on remand was much more developed than the record was before this court in the first summary judgment proceeding. In the first summary judgment proceeding, the record consisted essentially of some deposition testimony of Ms. Simpson's husband and a deposition of the sheriff. There were a couple of additional documents, but the record before the court below contains three additional depositions of the jailers who were at the Yonge County Jail when this incident occurred. It contains two declarations or reports from expert witnesses. It contains transcripts of the actual phone calls of Mr. Simpson to the Yonge County Jail and a significant import here, videos. Videos were produced, footage from Ms. Simpson's arrest, as well as her time at the Yonge County Jail. So all of this evidence is significant and it's enough to raise a fact issue on causation. So that's one manner in which the court's analysis is flawed. This is not a matter of file documentation. And the second point I want to make there is that this is not even just a clerical issue, but this is a failure to actually properly complete the assessment. And it's not just a suicide screening. And if you look at the consistent testimony of all of the jailers that's in the record before this court, they interchangeably refer to this form as a suicide screen and a medical intake. This form is actually entitled Screening Form for Suicide and Medical and Mental Impairments. The questions that were not answered on this form have to do with the mental and medical state of the pretrial detainee. For example, the very first question on this form is, does the arresting officer or any other person believe that an inmate is at risk due to medical condition, mental illness, mental retardation, or suicide concern? That question was not answered. The additional observations that were not filled out were not only not filled out, but they were not considered in the assessment process. These have to do with things pertaining to Ms. Simpson's demeanor, her speech, whether she's observed to be under the influence of drugs, whether she's observed to have visible signs of self-harm, and whether the screener suspects mental illness. Now it's not just a matter of filling these out. It's a matter of taking these observations, which are critical, into consideration. And that's critical to the causation analysis in two respects. One, the overwhelming uniform testimony of the jailers in this case established that they accepted these self-report answers from Ms. Simpson at face value, regardless of the fact that she was intoxicated and clearly impaired, and regardless of the fact that there was ample evidence at the jail to the contrary. For example, on the record before this court, Jailer Rich testifies in her deposition that she was told that Ms. Simpson ingested medication, yet she accepted her response that no, she's not on medication. And Jailer Rich was questioned in her deposition where you saw the medication. If you look at the video, the arresting officer comes in with a bag of pills and spreads them out on the bookend table. Right across from Ms. Simpson, Jailer Rich walks over and she actually observes and handles some of the medication, and yet the form says no. And what her testimony was is that I accept what she tells me. I go by what she tells me. That was also strikingly consistent with the testimony of Jailer Burt, who said yes, Mr. Simpson did call me. He called before Ms. Simpson even arrived and told us that she was missing, she was located, pursuant to a missing persons report, and that she had threatened suicide. But I don't know if I told the other jailers. I think I would have. This was his testimony. It doesn't really matter. Did the evidence in the Montana case involve a failure to then fill out the bottom form of the check-in suicide form or not? Yes, Your Honor. I think if you go back and read Montano, there were many similar failures. One of them was, in fact, failing to screen the inmate, because they put Montano in the bubble, assuming he was detoxing from drugs, but that was never confirmed. They didn't fill out the assessment at all. I don't even know that it was the bottom section, but there was a definite failure in that case to screen him. There was also similar failures in that case of, well, that case was not running a CCQ, which showed prior mental health history. Now here, in the first summary judgment proceeding, this court noted, well, we don't know she would have been a match on CCQ, but now we know she was a match on CCQ. The CCQ was run here, but it was never considered. Is that exactly what the record is? I thought there were levels of match, and she came back as a possible. Well, I think all the levels of match, my understanding is all the levels of match are a possibility that then have to be confirmed. That showed that she probably, or possibility, had had prior mental health services, and it would have been confirmed, as she had. But the consistent testimony of the jailers was, it wasn't considered. And there was testimony in this record that it should have been considered before she was put in a jail cell, but the reason that it wasn't was because she answered no. She had never received prior mental health services, and the clear custom and practice of the court was to accept those answers at face value, despite the fact that she was intoxicated, and despite the fact that there was overwhelming evidence that she was in the midst of a drug overdose. Now, one thing I want to point the court to in bringing up Montano, another similarity in this case in Montano, is the fact that the custom and practice, the clear custom and practice of the court, is directly contrary to the written policy. And I think this speaks to causation, because if you look closely at the written policy of the jail that wasn't followed, if these critical observations had been made, truthfully made, taken into consideration, I mean, you can see her on the video, what her physical status was, the jail would have been under a duty to take additional action. They would have had to do further assessment or classify her differently under the terms of their prevention policies if a suicide threat is indicated. In this case it was, because Mr. Simpson called the jail and told them she threatened suicide, she should have been pursuant to their written policy, further assessed or classified as a level four, which would have required immediate notification of MHMR under their crisis hotline. Well, my understanding, just because you've argued lucidly, but the district court erred because if we accept the single de facto policy that the district court found, the failure to complete the thing, the court erred legally as to its causation standard by embracing Sanchez One? Is that? Yes, Your Honor. Not just by embracing Sanchez One, by sort of piggybacking onto Sanchez One and just characterizing this as a matter of foul documentation and ignoring evidence in the record that raises a fact issue on causation in its conclusion that there's no evidence in this record. And the fact issue is that the failure to complete itself caused the lack of medical care because it's designed to get medical care or it interacted with other policies such as the jailer testimony that we put people who are intoxicated to sleep it off. That's just what we do and medical care comes later. Both. I think it means both. In this case, if the form had been completed, it would have, if the observations had been made and the assessment had been done properly, it would have led to her being properly classified, more closely monitored, likely receiving medical treatment. However, additionally, this policy of not completing the form, the constitutional violation, the causation is exasperated by additional de facto policies that weren't considered by the court, which was a clear policy of we don't consider outside information. We're not going to contact MHMR if you're intoxicated. You say they weren't considered. I thought in, I'm sure you know the order pretty well. I thought in footnote eight, he actually lists the jailer testimony and suggests that it isn't their policy to just put people in the bubble and wait till they sleep it off. In this case, I don't think the court considered the entire realm of evidence before it. The court did consider and dismiss some of the testimony. For example, the expert witnesses. The court acknowledged there was expert testimony in the record that, A, that by a jail operations expert that the protocol here resulted in the jail ignoring critical information and not properly evaluating and classifying her, and B, that there was medical expert testimony saying had she been attended to with medical treatment sooner, she would have survived. There was testimony dismissed, but the court did not adequately consider policies of not considering outside information, and to the extent that the court may have found that the evidence was not conclusive to be pervasive enough, I would submit to the court that is a fact question. There is very clear testimony in this record that establishes a custom or practice of this court, excuse me, of this jail to not consider outside information. Jailer Dunson signed the arrest report but said he did not read it. Jailer Burt got phone calls from a family member. Under the jail's written policies, that information is supposed to be considered, but it was their clear policy not to consider it. Jailer Rich testified very clearly she would not have considered even seeing the medication. All the jailers testified. We took her word for it. That was their custom and practice. To the extent that the court below found the evidence insufficient to meet that pervasive  Let me ask you one thing before your time is almost out. What is the most meaningful distinction, in light of this court's prior opinion, what's the most meaningful distinction between the episodic act or omission claim and the conditions of confinement claim? I know you just went through the factual considerations. Right, Your Honor. Well, the conditions of confinement claim here, it's aimed at the systematic failure of the jail to complete a proper assessment and evaluation of the mental health and medical needs of the intoxicated detainee once they arrive at the county jail before they're placed in a holding cell to sleep. And the episodic acts, I mean, those are individual failures of the jailers. You know, episodic, by definition, means occurring sporadically. There's clear testimony in this record of a very pervasive custom that amounts to, in fact, failure to assess and evaluate incoming detainees that are intoxicated. You would say that would include both of the things that Judge Higginson just asked you about? Both of those factors? Yes, Judge. Thank you, Counsel. You have rebuttal time. May it please the Court, I'm Stephen Caswell Island. I represent a young county together with my partner, Robert Hawkins. We're with the Squire Patten Logs firm in Dallas. This case is a very clear-cut, episodic acts case. Your prior decisions in this area, which are numerous, three of which you have authored recently, Judge Higginson, are totally dispositive of this case. And you prevailed, that's law of the case, but the prior panel remanded for conditions of confinement. Right. So that's where we are. And so, in abundance of caution, the prior panel remanded. Let me give a little context, if I can. This case arose via a petition in Texas State Court, which we removed. An original petition barely touched on the issue of conditions of confinement. So, we waited until the discovery period had elapsed, and we filed the motion for summary judgment. And we attacked the claims on the basis of episodic acts. The prior cases to us all seemed to be episodic acts analysis. Judge O'Connor agreed, and he wrote a very thoughtful opinion dismissing the case based on the prior decisions of this court in the episodic acts area. So, we went to the first appeal. Judge Barksdale dissented, the panel decided, well, there was some mention of conditions of confinement, so we're going to send it back to Judge O'Connor and let him consider that. The plaintiffs, at that point, went out and hired very good counsel, indeed, the very lawyers who had just, some couple of years before, litigated the Montana case. And at that point, the plaintiffs' lawyers started to try to take this case, take a square peg and put it in a round hole, as the expression used in the City of Donald case. And it doesn't fit. It doesn't fit at all. But isn't there almost identical jailer testimony as there was in Montana? In other words, Rich and Cook and the others said, we have a sleep off policy, so we really don't even fill out the intake forms, and if the husband calls and says she needs care, we just aren't going to listen until she's slept it off. No, Judge, there isn't. In fact, the jailers in Yonge County never talked about sleeping it off. Ms. Rich, who is a very experienced, well-trained jailer, the evidence in her deposition says she'd been a jailer in Yonge County and Jack County right next door for 14 years, she said, my approach is to fill out the entire form and then proceed with the rest of the bookend if they are able. But if they are so intoxicated that that's not going to be effective, I sometimes let them sleep for a while. In this case, she was back in the cell many times, and she had conversations with Ms. Simpson, according to the record. And that evening, well, let me go back one step. So if you look at the form, as Judge O'Connor has and a succession of other judges, you might ask, why would this jailer not fill out the bottom of the form? It takes just probably a couple of minutes. So she was asset in her deposition. Deposition is taking place more than five years after Ms. Simpson died. She says, I don't remember what I was, something must have come up. I thought on remand, the district court did find there was a policy of just not filling out that bottom portion, and that's not debated. Well, that, what the judge said, I think what Judge O'Connor said, there's a policy, there is a fact question as to whether that was really the policy. But the testimony of the jailers indicated that they did not fail to fill out the bottom of the form all the time. The Jail Standards Commission came in, as you've seen in the record, on the very day that Ms. Simpson died. And they did a random sample of those suicide forms and reported that there were various forms that had not been filled out. And please, you know, start filling out the form in its entirety. Let me back up a little bit. What type of information specifically is the bottom of the form designed to collect? And who sees that once it's filled out? And that, Judge, that is the reason, the answer to that question presents the real red herring in the case. Because the form, the bottom of the form is just recording what the jailers' observations were at that time. And in this case, we have the same jailer. We're not talking about a jailer several months later who looks at the form and can't tell, gee, what did Jailer Rich think? Other jailers that are on duty at the same time, do they have access to that information? Or are they, have direct interaction with the inmate? In this instance, in this instance, there are three jailers on duty for 86 inmates, which was the sufficient number according to the rules. And there was one in the control room. He can't come out of the control room. He opens the cell doors electronically and whatnot. He has cameras looking into the restraining cell where Ms. Simpson was. And there's two other jailers taking care of 86 inmates and processing people as they come in. So when you look at the record and say, I wonder why Mrs. Rich didn't fill out the bottom of the form. It seems so easy. And I'll tell you probably why she didn't. The record indicates, and later in her deposition, this is at page 1220, Sunday night, when all of this incident happened, is church night in the jail. Ms. Rich testified that a jailer has to go around and ask all 86 inmates if they want to go to church. Sunday night is the night of all of the cleanup of all of the bookend area. Sunday night is the night when the female trustees go in and clean up the kitchen. So there was a lot going on in that jail with just two jailers out on the floor. So perhaps that explains what happened to Mrs. Rich that night. But in the end, Judge O'Connor's conclusion that there's no correlation between this and what happened to the lady. She was intent on taking her own life. She lied to the jailer. She lied to the police. She lied to the EMS. So I want to mention about Young. Let me ask you about that in particular. Absent an inmate claiming to be suicidal, what would trigger the transferring of an inmate on a potential suicide watch? Well, for a suicide watch, absent a direct statement, the testimony would be, if they were really acting strangely, for example, if they were acting strangely, even though they denied that they were mentally ill or suicidal, they would send them out and get them mental health assistance. And so that's based purely on an evaluation by whoever's working at the jail. And this person is acting a certain way, and they're trained to recognize that? And the record indicates that, for example, Ms. Rich and the jailer Dunstan that night, they both had suicide prevention training. Are they trained to distinguish between whether someone's merely intoxicated or suffering from a drug overdose? If they were really- Which would require hospitalization? Testimony was completely consistent with all three of the employees whose depositions they took after remand, that those people who were really highly intoxicated, they will send directly to the jail. They will not allow the arresting officer to drop the prisoner off. Those people go to the jail. This was a well-run jail for a county that has had 18,000 residents since at least 1980. And there has never been another death in the jail. This court is, other than Montana, which is a real, really an outlier case. I thought on remand, they put in evidence that this jail had had consistent citations for improper monitoring, 29, 2010, 2011, and then even again after her death, no? Not really, no, Judge. And we have outlined exactly what those were in our brief. So let me talk about the inspection on the day of her death. Well, no, I was asking. What I thought, when they were able to offer evidence, I thought, actually, the district court accepted that there was a policy that the jailers didn't record their personal observations, and that he said there's a genuine dispute of fact as to that. So we're given that, and then if the jailer testimony as in Montana is really with people that come in intoxicated who deny that they're suicidal, we let them sleep it off. And in that context, I guess it's a variation of the question that was asked before. How would this jail ever catch somebody that wanted to commit suicide but denies it? If they're not going to fill out their observations, and then the husband, the outside information calls and says, watch out, she is, no matter what she says, she's suicidal, and the response is, well, we'll wait and figure it out after they sleep it off, and then they're not monitoring their troublesome aspects to monitoring. Wouldn't that, all those conditions of confinement, interact to deny her medical care at the critical time? Isn't that just their argument? Well, that indeed is their argument. And they've offered evidence as to all three conditions. The facts don't line up with their argument, Judge. Because what they, their argument omits two essential, essential issues here. One, we never had a death in the jail. They can't prove that the forms or our supposed lack of- We shut that door. We shut that door in Montana, right? The court was quite explicit. In a conditions of confinement case, you don't have to show another violation. You don't have to show that there was another death. Okay, so that's not an issue that is crucial at all. We've said as a matter of law, you don't have to do that. But, but Montana showed that there was a consistent policy in the jail to ignore people once they got in the bubble.  That here, we don't have evidence of ignoring people when they're in the holding cell. And, and moreover, she, the, the appellants went to argue, Judge, that we, that we failed to monitor, that we closed ourself off from outside information. What happened to the six hours of videotape? I'm sorry, Judge. What happened to the six hours of videotape that was supposedly lost? The videotape, well, we're, we're in a new age. We have all this technology now. And the assistant jail administrator, once the investigation was well underway by the Texas ranger, tried to transfer the video from one place to another place to give it to the ranger. And he succeeded in losing a part of the video. And the, the ranger. You mean the expert who was asked to transfer it? Yes, well, he was, we don't have video experts in, in Yonge County, but we had an assistant jail administrator who thought he knew how to transfer it. Some of it got lost. The critical part about her coming into the, to the jail was saved. And the part about being in the, from 2 a.m. on was saved. The, the Texas rangers investigated that and found no fault other than incompetent guy trying to, trying to transfer the, the technology. It was regrettable. We're very sorry it happened, but it doesn't influence the outcome. Because, for example, we still had electronic evidence of jail cell checks being conducted. But back to my other point, the appellants, they, they want to ignore these two points. We never had another death. Montana says that's not required, but Montana showed that you had a succession of indisputable evidence that they put people in the bubble and just forgot about them. You don't have that here. And what we have, what they. It takes a deep dive, but I imagine opposing counsel's going to get up and say that is just what we have, and then quote Administrative Cook, Administrator Cook and Jailer Rich saying that's just what they did. They had a sleep off policy. Well. But you'll say that's not what the evidence shows each of them testified to. So, that's a verifiable fact in the record. What's your second major point that distinguishes, you were, you were going to get to it? This. Besides no prior death. Now, what distinguishes this case, in addition to many other factors, is that this lady was arrested out on the street in Graham, Texas. They parked her car. The city police come and look at her. They ask her all these questions. They call the emergency medical people. And they come out, and there's videotape of this. They're out there for an hour. They release her to go to the jail. The, the jailers know that she has seen the EMS. The testimony from Ms. Rich was, I knew the policeman, Officer Ford, very trusted guy. He's not going to bring us somebody that he, he thinks is, is, is probably a suicide risk. So, that's the kind of outside information that the jailer had at the time of the, the booking that I think was critical in this case. And certainly, Judge O'Connor thought it was supremely important. And that, that's in the record at 1307 and 848. They want to say that, and they do say in their brief repeatedly, that poor jailer Rich knew the woman had taken all these pills based on her interaction with Officer Ford. That is not in the record. That's not in the record at all. She denied that she knew that she had taken pills. She said, I, he told me about the pills. He told me about the pills. And, and he told me that she had ingested, she may have ingested some medicine. That's what I, Officer Rich knew when I put her in the cell. And that's at 1201 and 1203 in the record. That's what she actually knew. Not that she had, that, that the arresting officer told her, this woman has taken 25 Benadryl. Finally, there's a, there's been a lot of discussion about this mysterious CCQ, the continuity of care query that they're supposed to do. There's much confusion about that. Texas law requires jails to run this test to see if the arrestee has been treated in some mental institution. If it comes back positive or probable, they're supposed to tell the magistrate who is going to hold the bail hearing the next day. Look at this CCQ result because you may want to factor her mental or your bail decision. That's all they're required to do. That's, that's what the law requires them to do with the CCQ. Now Ms. Rich testified, she would do more. If once she read the CCQ, considered it, if it was positive, she'd call the mental health people and have them come out. In this case, it's Sunday night and we have an impaired person. And the testimony was consistent, never rebutted by the appellants. The mental health people will not come out and see inebriated arrestees for obvious reasons. So we would ask the court to affirm Judge O'Connor. Indeed, there was a January 20th decision by a panel that was headed by Judge Owens that just adopted the district court's opinion in the McLennan County case. It was a jail death case. I think you could do that in this case. Thank you. Council. I'd like to address some of the court's questions. To, I guess it was Justice Higginson's question, how would you ever protect someone who is intent on committing suicide in the jail if you take the answers to the questions at face value? And the answer is you wouldn't. They would not be able to. The overwhelming testimony established they took those answers at face value and did not make other critical observations. The second question was, or there was a question about what would trigger a transfer to a hospital. So this is an interesting question before the court and it would be critical observations that were not made in this case that should have been. Under the written policy of the jail, if a person comes in exhibiting symptoms of serious medical needs, they are to be taken and given a medical treatment or to be cleared by a physician. If the appropriate observations have been made in this case, that should have been done and was not. So there is a clear written policy on what triggers taking somebody to the hospital. Now, in terms of alcohol intoxication, I think there was some reference to testimony. Well, maybe if this or that's going on, they'll take them. The clear testimony there, and it was in line with, for the most part, with the written policy is that if someone's intoxicated on alcohol, we know their BAC, such as in a DWI case, if they have a 0.03 or a physician, that's the policy. Well, there is no corresponding written policy for somebody who's exhibiting symptoms from a drug overdose. So the observations that have to be made are very critical. Another question was, what is the form designed to do? What are those observations designed to do? And the written policy makes clear that the form, the screening form, is a starting point. It says indication of suicidal and mentally disabled inmates commences with the filling out of that form. But the policy clearly states, if a pretrial detainee is incoherent or unable to answer the questions, the detention staff is directed to make use of other information, such as of the arresting officer, the inmates' family and friends, and MHMR staff. None of that was done here pursuant to their custom and practice not to do so. So the purpose of the form is supposed to be a starting point in the assessment. Had critical observations been made, additional steps would have been needed to have been taken in classifying this individual as a suicidal detainee and potentially at a higher precaution level. In terms of Montano, there are very few distinctions between this case and Montano, and frankly none that are meaningful to this court's review. One thing that is significant to note is that Montano was an appeal following a jury verdict. There were a lot of witnesses in Montano. This is an appeal following summary judgment. The plaintiffs were not required to conclusively prove their case. We were required to raise a fact issue, and we have done so with very consistent, pervasive testimony, just as in Montano. The defendant stated that calling a medic is one of the things that distinguishes this case from Montano. I would disagree with that. I think the fact that the officer saw signs and symptoms that he felt were of such a nature that this particular individual needed medical treatment should have been a huge red flag for the jail. Because she was not released to go to the jail, she refused treatment. All they did was take her vital signs and note that she refused treatment and refused to go to the hospital. When he got to the jail and told them that he called a medic, that should have raised a huge red flag because he saw signs and symptoms of a serious medical need, which triggered their written policy under which she should have been cleared by a physician, not an EMT just taking vital signs. And at a minimum, she should have been more closely monitored, knowing that information. But again, it was their policy and their practice not to consider that information. When you say could have been closer, is he correct in stating that the video deletions were not pertinent times? The inadvertent or deliberate deletions? Judge, I disagree with so much of what was stated in regards to the record. No, he's incorrect. The video evidence only establishes two checks. There are six hours of missing video footage. We have no idea what happened with Ms. Simpson at the jail between the hours of 8 p.m. and 2 a.m. During the actual times that we have video footage available, which were between the hours of her original bookend, and then when she goes in the cell from 6.52 to 7.52, there's one check. Now, the WAN system records more, but you can see on the video when the window opens, and there's only one. And then between 2 a.m. and 3.30, there's, again, the one check, which I think happens right before they find her unresponsive. Okay, thank you, counsel. Thank you all. The final case of the day is submitted. We stand in recognition.